**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

|  |  |  |
|---|---|---|
| RALPH B., | ) | NO. ED CV 19-1695-E |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| ANDREW SAUL, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PROCEEDINGS**

Plaintiff, then represented by counsel, filed a complaint on September 5, 2019, seeking review of the Commissioner's denial of benefits. On October 3, 2019, the parties consented to proceed before a United States Magistrate Judge. On February 3, 2020, the Court granted Plaintiff's counsel leave to withdraw. Plaintiff, now, <u>pro se</u>, filed a motion for summary judgment on February 26, 2020. Defendant filed a motion for summary judgment on April 27, 2020. Plaintiff filed opposition to Defendant's motion for summary judgment on May 20, 2020 ("Plaintiff's Opposition"). The Court has taken the

motions under submission without oral argument.  See L.R. 7-15;
"Order," filed September 6, 2019.

**BACKGROUND**

Plaintiff, a former janitor, filed an application for
Supplemental Security Income on or about March 6, 2015, asserting
disability since July 28, 2014, based on, inter alia, alleged
rheumatoid arthritis, anxiety, high blood pressure, high cholesterol,
scoliosis, schizophrenia, tachycardia, angina, diabetes (type 2),
hypoglycemia, osteogenesis imperfecta (brittle bone disease), Osgood-
Schlatter disease, depression and multiple concussions (Administrative
Record ("A.R.") 24, 142, 149-51, 238, 306-14, 332-33).  An
Administrative Law Judge ("ALJ") reviewed the record and heard
testimony from Plaintiff, Plaintiff's mother and a vocational expert
(A.R. 24-35, 145-95).

The ALJ found that Plaintiff has severe degenerative changes of
the cervical, thoracic and lumbar spine with lumbar radiculopathy and
sensory-motor peripheral neuropathy of the lower extremities, as well
as a mental impairment "varyingly diagnosed as bipolar disorder and
///
///
///
///
///
///
///

2

major depressive disorder" (A.R. 26).[1]  However, the ALJ also found
that Plaintiff retained the residual functional capacity to perform
medium work, limited to: (1) sitting no more than six hours and
standing and/or walking no more than six hours in an eight-hour
workday with normal breaks; (2) frequent climbing of stairs and ramps;
(3) occasional climbing of ladders and scaffolds; (4) frequent
balancing, stooping, kneeling, crouching and crawling; (5) no
unprotected heights, heavy vibrations and workplace hazards; (6) no
more than occasional exposure to extreme cold; (7) no operating motor
vehicles commercially; and (8) performing routine, repetitive tasks
without high production quotas in a non-fast-paced environment.  See
A.R. 30-34 (giving significant weight to internal medicine
consultative examiner's opinion and state agency physicians' opinions,
but also giving Plaintiff the benefit of doubt regarding his mental

///
///
///
///

---

[1]     The ALJ found "nonsevere" Plaintiff's alleged
hypertension, scoliosis, angina, tachycardia, hypoglycemia,
Osgood-Schlatter disease, rheumatoid arthritis and osteogenesis
imperfecta, reasoning that: (1) Plaintiff assertedly had not
alleged any work-related limitations attributable to these
conditions; (2) Plaintiff's hypertension was well controlled;
(3) there assertedly was no evidence of tachycardia or angina
persisting beyond one hospital visit on July 29, 2014; and
(4) there assertedly was no objective evidence of hypoglycemia,
Osgood-Schlatter disease, rheumatoid arthritis or osteogenesis
imperfecta in the record (A.R. 26-27).  As for Plaintiff's
alleged schizophrenia, the ALJ acknowledged a previous diagnosis
of schizophrenia but stated there was no such diagnosis "dating
from the alleged onset date or later" (A.R. 28).

impairment(s) in limiting Plaintiff to routine repetitive tasks).[2]

The ALJ identified certain jobs Plaintiff assertedly could perform. See A.R. 34-35 (adopting vocational expert testimony at A.R. 189-91, identifying several medium and light jobs that could be performed).[3]  Accordingly, the ALJ denied benefits (A.R. 35).  The Appeals Council considered additional evidence but denied review (A.R. 6-11).

**STANDARD OF REVIEW**

Under 42 U.S.C. section 405(g), this Court reviews the Administration's decision to determine if: (1) the Administration's findings are supported by substantial evidence; and (2) the Administration used correct legal standards.  See Carmickle v. Commissioner, 533 F.3d 1155, 1159 (9th Cir. 2008); Hoopai v. Astrue, 499 F.3d 1071, 1074 (9th Cir. 2007); see also Brewes v. Commissioner,

---

[2]    In finding this capacity, the ALJ discounted Plaintiff's statements regarding his subjective symptomatology as "not entirely consistent with the medical evidence and other evidence in the record," including Plaintiff's conservative treatment with over-the-counter pain medications and his "relatively high level of daily activity, including vacuuming, carrying out trash and washing dishes" (A.R. 30-34).  The ALJ also gave little weight to the testimony of Plaintiff's mother as concerning many asserted impairments unsupported by the post-alleged onset date medical record (A.R. 33).

[3]    The vocational expert testified that, if a person were further limited to superficial interaction with the public, several jobs would be precluded, but other medium and light jobs would still be performable (A.R. 191-93).  The vocational expert also testified that, if a person were off task more than 10 percent of the work day, all work would be precluded (A.R. 193).

682 F.3d 1157, 1161 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation and quotations omitted); see also Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).

> If the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ.  But the Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence.  Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [administrative] conclusion.

Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and quotations omitted).

Where, as here, the Appeals Council "considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence."  Brewes v. Commissioner, 682 F.3d at 1163.  "[A]s a practical matter, the final decision of the Commissioner includes the Appeals Council's denial of review, and the additional evidence considered by that body is evidence upon which the findings and decision complained of are based."  Id. (citations and quotations

///

///

omitted).[4]  Thus, this Court has reviewed the evidence submitted for the first time to the Appeals Council.

## DISCUSSION

After consideration of the record as a whole, Defendant's motion is granted and Plaintiff's motion is denied.  The Administration's findings are supported by substantial evidence and are free from material[5] legal error.  Plaintiff's contrary arguments are unavailing.

## I.   Summary of the Testimony and Statements of Plaintiff and His Mother

Plaintiff's mother testified that Plaintiff had a schizophrenic "episode" that started in April of 2014 and culminated in Plaintiff hitting her in July of 2014, for which Plaintiff was arrested (A.R. 172-73).  The mother claimed that, at the time of the arrest, Plaintiff was paranoid, thought people were following him, thought

---

[4]     And yet, the Ninth Circuit sometimes had stated that there exists "no jurisdiction to review the Appeals Council's decision denying [the claimant's] request for review."  See, e.g., Taylor v. Commissioner, 659 F.3d 1228, 1233 (9th Cir. 2011); but see Smith v. Berryhill, 139 S. Ct. 1765 (2019) (court has jurisdiction to review Appeals Council's dismissal of request for review as untimely); see also Warner v. Astrue, 859 F. Supp. 2d 1107, 1115 n.10 (C.D. Cal. 2012) (remarking on the seeming irony of reviewing an ALJ's decision in the light of evidence the ALJ never saw).

[5]     The harmless error rule applies to the review of administrative decisions regarding disability.  See Garcia v. Commissioner, 768 F.3d 925, 932-33 (9th Cir. 2014); McLeod v. Astrue, 640 F.3d 881, 886-88 (9th Cir. 2011).

people were tapping his phone lines, and thought people at work were putting things in his food and drink (A.R. 172).  After his arrest, Plaintiff was taken to Behavioral Health at Arrowhead Regional Medical Center, then to West Valley jail, and then to a board and care facility where he stayed until October of 2017 (A.R. 173-75). According to the mother, Plaintiff had eight previous inpatient hospitalizations for mental health issues, but had gone 15 years without an incident (A.R. 174).  Plaintiff was living with his mother at the time of the hearing, and reportedly had been clean and sober since the July, 2014 incident (A.R. 171, 176).

Plaintiff testified that he had not worked since he had been released from jail (A.R. 151-52).  Although Plaintiff had considered getting a job, Plaintiff said he had not looked for work because he has a felony conviction, which he was attempting to get reduced to a misdemeanor (A. R. 153).  Plaintiff said he was concerned he would not be hired because of his felony record (A.R. 153).  Plaintiff also testified that he could not work because he has severe back pain, knots in his knees, pain in his feet, hands and legs (which he thought could be due to arthritis) and a mental illness which began when he was 18 years old (A.R. 156-58, 160-63).  Plaintiff treated his back pain with ibuprofen and over-the-counter creams (A.R. 158-61). Plaintiff was taking Depakote, Abilify and Benadryl for his mental illness (A.R. 164).

Plaintiff testified that his condition limits his ability to lift objects and handle tools (A.R. 161).  Plaintiff also said that his medication makes his mind "foggy" (AR. 166).  Plaintiff said he could

lift up to 20 pounds, sit for 15 minutes before needing to get up to stretch, and stand for 15 minutes before needing to sit down (A.R. 168-69).  Plaintiff said he spent his days sitting, walking, taking care of himself and doing household chores (washing dishes, taking out the trash, vacuuming) (A.R. 169).[6]

Plaintiff testified that he thought he could do a simple, low stress job where he could move around, not have to lift more than 20 pounds and not have to sit or stand all day (A.R. 169-70).  Plaintiff said that he had not looked for such a job because of his felony record (A.R. 170).

Plaintiff's mother testified that Plaintiff had not worked since the July, 2014 incident because he assertedly is very lethargic, has a hard time with his back, diverticulitis, frequent urination (every

---

[6]     In a Function Report dated October 25, 2015, Plaintiff and his mother reported that Plaintiff was living in a group home and had lost his job as a janitor due to schizophrenic symptoms (A.R. 351-61).  Plaintiff reportedly: (1) could not lift more than 10 pounds without extreme pain in his hands and back; (2) could not use his back, arms, legs, feet or hands more than 15 minutes at a time without extreme pain; (3) could not sit or lie down more than 20 minutes at a time without pain and must change positions constantly through the night; and (4) had drowsiness, dizziness, tremors, muscle weakness, palpitations, confusion and fatigue from his medications which greatly affect his cognitive skills and keep him "half awake" (A.R. 351).  Plaintiff reported that his days consisted of taking his medications, showering, eating breakfast, lunch and dinner, watching television, assisting with cleanup after dinner and resting (A.R. 352).  Once a week, he attended a mandatory behavioral health class by taking a bus to and from the class (A.R. 352).  He was able to manage his personal care, do his own laundry, and help with clearing dishes after meals (A.R. 352-54).  He reported that he had no problems getting along with his family or others (A.R. 357).

15-20 minutes) due to an enlarged prostate, borderline diabetes, hypoglycemia, neuropathy in his legs and hands, a herniated disc, Smorels [sic] nodules in his spine (a degenerative condition), scoliosis and pain (A.R. 176-77). She stated that, because of Plaintiff's drug abuse history, he is unable to take anything other than Tylenol or ibuprofen for his pain (A.R. 177-78). He manages his pain by changing positions, but supposedly still has discomfort (A.R. 178). She said Plaintiff has a hard time holding things in his hands, has hearing loss, is nearsighted, is very forgetful and has difficulty completing tasks (A.R. 178-79). She said Plaintiff spends his days doing a "variety" of things, like making his bed, feeding their three large dogs and letting the dogs in and out of the house (A.R. 179-80). She claimed to think that Plaintiff would not be able to work more than four hours a day and would have difficulty doing even simple and repetitive tasks for more than an hour (A.R. 180). She said Plaintiff does not like to be nagged, is easily agitated, and does not see things that need to be done and do them without being prompted (A.R. 180). Plaintiff's mother claimed to think that Plaintiff's extreme lethargy was a side effect of the medications he was taking, and said that he vacillates between extreme lethargy and agitation (A.R. 181-82). Plaintiff's friends and family reportedly had been apprehensive about being around Plaintiff since he had hit his mother (A.R. 183).

///

///

///

///

///

1  Plaintiff had not had a prior violent incident (A.R. 184).[7]

2

3  **II.   Summary of the Relevant Medical Record**

4

5  Plaintiff went to the emergency room on July 29, 2014, for body

6  aches, shortness of breath and intermittent chest pain for the

7  previous five days, with his family reporting that he was a recovering

8  alcoholic and methamphetamine user with 18 years of sobriety who had

9  bipolar disorder/schizophrenia and hypertension (A.R. 593).  Plaintiff

10  reportedly drank alcohol heavily the night before and was acting

11  unusually (A.R. 593).  On examination, Plaintiff reportedly had

12  tachycardia (A.R. 594, 600).  Plaintiff did not want to wait for lab

13  results and was discharged on his own for "non-specific chest pain"

14  (A.R. 594).  He was ordered to follow up with the behavioral health

15  unit for psychiatric consultation (A.R. 594).

16

17  Plaintiff was brought back to the emergency room on July 31,

18  2014, for a possible psychiatric hold after he had punched his mother

19  in the face (A.R. 583).  Plaintiff admitted that he had punched his

20  mother in the face several times, claiming he had been scared she

21  would hurt him and make him pee on the floor (A.R. 591-92).

22  Reportedly, Plaintiff had been in fear of people coming after him and

23  had experienced auditory and visual hallucinations (A.R. 583).

24

_____

25      [7]   Plaintiff's mother submitted a lengthy letter to the
26  Appeals Council addressing missing medical records and alleging
    errors in the ALJ's decision (A.R. 474-556).  She previously had
27  submitted to the ALJ medical records and a summary regarding
    Plaintiff's health beginning with Plaintiff's birth (A.R.
28  683-1297).

Plaintiff claimed that he had a history of paranoid schizophrenia and recurrent depression, anxiety, insomnia and poor impulse control, but he denied any current substance or alcohol abuse, although he admitted he had started drinking again (A.R. 589, 591-92).

On examination, he reportedly was disheveled, alert, depressed, labile, had circumstantial, tangential and disorganized thought, was both cooperative and reluctant (reporting fear that he would be attacked by staff), had both poor _and_ good eye contact, had pressured speech, and had auditory hallucinations and delusional thoughts (paranoid and grandiose delusions about people wanting to hurt him) (A.R. 584, 590, 592). Plaintiff reportedly was "very delusional" and "very paranoid" (A.R. 590-91). Plaintiff was diagnosed with psychotic disorder (not otherwise specified), and he was returned to jail on August 1, 2014, with prescriptions for Risperdal and Depakote prescriptions (A.R. 585, 592).

Plaintiff's jail intake evaluation reported that he was scared but did not want to hurt anyone else, and Plaintiff was placed on suicide watch (A.R. 559, 574). Later, he was cleared to continue with behavioral health (_id._). Plaintiff reported that he was drinking a few beers a day (A.R. 560). Plaintiff denied having any problems with mood swings, depression or hearing voices (A.R. 560, 573). On examination, Plaintiff reportedly was cooperative, calm with appropriate speech, depressed, had flat affect and answered some questions with confusion (A.R. 569). He was given Depakote, Risperdal and Benadryl while he was in jail (A.R. 561, 831-44).

///

By August 18, 2014, Plaintiff reportedly denied any psychiatric symptoms or depression, his affect was appropriate, mental status examination was normal and he was assessed with a Global Assessment of Functioning ("GAF") score of 55 (A.R. 576, 578-79).[8]  Plaintiff reported a remote history of drug use (i.e., over 12 years prior) and claimed that he last used alcohol one month earlier (A.R. 578).

On October 3, 2014, Plaintiff reported that his "meds are good" and that he thought he had schizophrenia (A.R. 572).  He reported a history of anxiety, excess worry, nervousness and anger, but denied any hallucinations or delusional thinking (A.R. 572).  He reportedly was cooperative, had slow speech, a flat affect, and concrete thinking with limited insight (A.R. 572).  Plaintiff said he had two prior hospitalizations from using drugs (A.R. 572).  He admitted a history of using cocaine and methamphetamine, but claimed that he had not used in 60 days (A.R. 572).  Plaintiff reportedly had been noncompliant with medications prior to his incarceration (A.R. 572).  Plaintiff was diagnosed with a mood disorder (not otherwise specified), with a note to rule out schizoaffective disorder, and his medications were continued (A.R. 572).

///

///

_____

[8]    The GAF scale is used by clinicians to report an individual's overall level of functioning.  See American Psychological Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM").  A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." Id.

On October 16, 2014, Plaintiff reportedly was stable on his medications (A.R. 613).  On October 28, 2014, Plaintiff presented to the San Bernardino County Department of Behavioral Health for a medication assessment (A.R. 652-55).  Plaintiff had been released from jail to a board and care facility and was seeking regular treatment (A.R. 652).  Plaintiff said he was taking his medications as prescribed and felt fatigued and sleepy after taking them (A.R. 652).  On mental status examination, Plaintiff reported being forgetful and having difficulty remembering and focusing, with poor insight and judgment (A.R. 655).

On November 17, 2014, a therapist reported observing symptoms of sadness, sleeplessness, anxiety, irritability, racing thoughts, inability to focus and feeling worthless (A.R. 748).  On mental status examination, Plaintiff reportedly had a reserved mood and quiet affect and said he was forgetful and having difficulty remembering and focusing, with paranoid thoughts, poor insight and poor judgment (A.R. 751).  Plaintiff was diagnosed with major depressive disorder (recurrent, severe with psychotic features), relational problems and alcohol abuse, with a GAF of 33 (A.R. 753).[9]

///

///

---

[9]    A GAF  score of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  See DSM, p. 34.

On November 25, 2014, Plaintiff stated that his medications were working for him and that he wanted to continue his treatment (A.R. 614).   On mental status examination, Plaintiff reportedly had depressed and irritable mood, auditory hallucinations, loose thought process, and paranoid delusions (A.R. 617, 619).   He was diagnosed with schizophrenia and alcohol dependence, and assigned a GAF of 40 (id.).

On December 1, 2014, Plaintiff reportedly had a diagnosis of bipolar disorder (not otherwise specified), alcohol dependence in early full remission and a GAF of 50 (A.R. 624).[10]   On mental status examination, Plaintiff reportedly was polite, withdrawn, spoke slowly, and was "uptight," with flat affect, fair insight and fair judgment (A.R. 726).

Dr. Shyam Kumbhani completed an Adult Psychiatric Evaluation dated December 9, 2014 (A.R. 640-41).   Plaintiff reported that he suffered from schizophrenia and depression and had been under psychiatric treatment since he was 18 years old (A.R. 640).   Plaintiff denied having any psychotic symptoms following a brief psychotic episode at age 18, and stated, "drugs bring out that stuff" (A.R. 640).   Plaintiff reportedly had become noncompliant with treatment and had experienced a series of drug problems (A.R. 640).   Plaintiff had received inpatient treatment twice when he was 18 years old, and again

---

[10]   A GAF  score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM, p. 34.

at age 35 when he was intoxicated with methamphetamine (A.R. 640).
Plaintiff admitted methamphetamine use from age 30 to 35, and cocaine
use from age 18 to 30 (A.R. 640).  On mental status examination,
Plaintiff reportedly was within normal limits, except for depressed
mood, fair insight and fair judgment (A.R. 641).  Plaintiff was
diagnosed with a mood disorder (not otherwise specified) and a GAF of
55 (A.R. 622-23).[11]

On December 30, 2014, a therapist completed an evaluation to
comply with Plaintiff's criminal justice system requirements,
reporting that Plaintiff's problem was drinking and that he was on
probation for 36 months (A.R. 648-49).  He was assessed with a GAF of
40, with "significant improvement" reported since his admission date
of November 17, 2014, when his GAF was 33 (A.R. 648-50).  Plaintiff
was discharged to the Probation Department (A.R. 649).

On January 13, 2015, Plaintiff reported to Dr. Kumbhani that he
was feeling a little better and Plaintiff said his medications keep
him calm, but also make him sleepy (A.R. 627).  His mental status
examination was within normal limits, and his Benadryl dose was
lowered (A.R. 627).

///

---

[11]   Plaintiff's mother stated that, contrary to Plaintiff's
reports to his providers, Plaintiff's hospitalization in July of
2014 was the eighth psychiatric episode associated with his
alleged schizophrenia, which dated back to when Plaintiff was 18
years old (A.R. 737).  Plaintiff's mother stated that Plaintiff
would usually deny any history of mental illness or symptoms, and
would attribute his aberrant behaviors to drug and alcohol use,
which Plaintiff's mother felt only exacerbated his mental
condition (A.R. 738).

On February 24, 2015, Plaintiff reported that he was feeling less drowsy since reducing the Benadryl (A.R. 626).  Plaintiff said that he had some anxiety and situational stressors and sometimes cannot sleep (A.R. 626).  His mental status examination was within normal limits, and his medications were continued (A.R. 626).

On August 26, 2015, Plaintiff reported that he had been feeling well and his mood had been "a little down but okay" (A.R. 732). Plaintiff denied any anger or hallucinations, and stated that he was getting along well with others at his boarding house (A.R. 732). Plaintiff's mental status examination was within normal limits, with fair insight and fair judgment (A.R. 732).

An initial psychiatric evaluation by an unknown provider dated August 31, 2015, states that Plaintiff needed documentation for social security (A.R. 633-35).  Plaintiff reported depressed mood, mood swings and feeling lethargic, but Plaintiff denied experiencing any hallucinations (A.R. 633).  Plaintiff was worried about losing his housing (A.R. 633).  He was taking Depakote, Risperdal and Benadryl (A.R. 633).  On mental status examination, Plaintiff reportedly was withdrawn with a flat affect, fair grooming, fair concentration, average intelligence, fair memory, limited insight, fair judgment and poor impulse control (A.R. 635).  He was diagnosed with bipolar disorder and assessed with a GAF of 65, with a highest GAF for the

///

///

///

///

past year of 68 (A.R. 635).[12]

On September 7, 2015, Plaintiff reported to Dr. Kumbhani that he had been sleeping better and his mood had been "good" (A.R. 625).  He denied any anger, mania or hallucinations, and stated that he was getting along well with others at his boarding house (id.).  On mental status examination, Plaintiff reportedly was malodorous and disheveled, with poor hygiene, flat/blunted affect, fair insight and fair judgment (A.R. 625).

On October 21, 2015, Plaintiff reported to Dr. Kumbhani that he was feeling well and his mood had been "pretty good" with his medications keeping him "pretty balanced out" (A.R. 681).  He denied any psychiatric symptoms and reported getting along well with others (A.R. 681).  On mental status examination, Plaintiff reportedly was withdrawn, with flat affect, fair insight and fair judgment (A.R. 681).

Subsequent medication management treatment notes through March of 2018 indicate that Plaintiff denied active psychiatric symptoms and reported that his symptoms were stable and well controlled with medication compliance (A.R. 665-66, 669-80, 1147-48, 1300).  Mental status examinations were within normal limits, but for some notations

---

[12]   A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  See DSM, p. 34.

of soft speech and flat affect (A.R. 665-66, 669-80, 1147-48, 1300).
Plaintiff was prescribed Risperdal, Depakote and Benadryl until June
of 2016, when his Risperdal was replaced with Abilify (A.R. 659-63).[13]

    There are relatively few treatment records for Plaintiff's
alleged physical problems during the relevant time period.[14]

_____

    [13]    Plaintiff also received weekly group counseling with
the San Bernardino County Department of Behavioral Health from
January of 2015 through September of 2017 for depression, mood
swings, anxiety and agitation (A.R. 58-133, 775-812).  In
February of 2015, Plaintiff reported he had an altercation with
the house manager where he lived and that he had been upset
thereafter (A.R. 782).  In March of 2015, Plaintiff reported that
he was doing better where he lived (A.R. 786).  In July of 2015,
Plaintiff reported mood fluctuations, impulsivity, isolation,
racing thoughts, paranoia, homelessness, inability to obtain
employment and a history of substance abuse (A.R. 67).  By
December of 2015, Plaintiff had been diagnosed with psychosis,
based on reports of delusions of the mafia being after him,
feeling his supervisor in the past was in the mafia, and beating
his mother because he supposedly thought she was in the mafia
(A.R. 82).  Plaintiff's commitments included staying clean and
sober (see, e.g., A.R. 102).  Plaintiff was on probation
throughout the time he attended group counseling (A.R. 132).

    [14]    Records from a 1993 workers' compensation claim for a
conveyor belt injury reflected complaints of low back pain
radiating to the right lower extremity, neck pain, headaches and
chest pain (A.R. 1097-1113).  Plaintiff reportedly had a prior
work injury to his back in 1988 (A.R. 1099).  He was diagnosed
with a cervical and thoracolumbar strain, chest pain of unknown
etiology and post-traumatic headaches for which he was placed on
light duty work (A.R. 1101, 1113).

    A treatment note from 1999 reported that Plaintiff was
diagnosed with chronic back pain and schizophrenia (A.R. 932-33).
Plaintiff apparently had an inpatient hospital stay in 1999, but
the records had since been destroyed (A.R. 964-66).  Plaintiff
had hernia surgery in 2000 (A.R. 912-13, 916-26).  Plaintiff
reported progressively worsening low back pain in 2000 and 2006
(A.R. 904, 908-09, 911).  Plaintiff went to the emergency room
complaining of chest pain in 2007, for which testing was normal
                                              (continued...)

Plaintiff treated with Dr. David Hernandez-Rodriguez from July of 2015 through at least December of 2015 (A.R. 981-86).  Plaintiff initially complained of a cough and pain in his hands and back (A.R. 986).  By December of 2015, Dr. Rodriguez-Hernandez had mentioned severe chronic back pain (severe degenerative joint disease) with cervical radiculopathy and schizophrenia, and the doctor had ordered testing, prescribed Soma, lidocaine patches and motrin and referred Plaintiff to various specialists (A.R. 981, 983-85).[15]

Neurologist Dr. Raj Karnani evaluated Plaintiff on November 16, 2015, for reports of radiating neck and low back pain that supposedly had been going on for years (A.R. 44).  Plaintiff reportedly was not

_____

[14](...continued)
and Plaintiff was given Ativan, Toradol and Vicodin (A.R. 953-63).

[15]    A November, 2016 left foot x-ray showed chronic changes at the IP and PIP joint of the fourth toe, and a possible non-displaced old fracture of the fifth toe (A.R. 1123).  January, 2016 bone density testing for osteoporosis screening showed osteopenia at the left femoral neck and at L1-L4 with moderate risk of fracture (A.R. 1114-15).  A January, 2016 CT chest scan reported mild diffuse thickening of the proximal third of the esophagus, mild bullous disease, and a few pulmonary nodules (A.R. 1117-18).  A June, 2016 follow-up CT chest scan showed multiple subcentimeter pulmonary nodules that were stable and findings suggestive of bilateral adrenal gland hyperplasia, greater on the left (A.R. 1119-20).  A February, 2017 follow-up CT chest scan showed stable pulmonary nodules as compared to the previous scan for which follow-up was recommended in one year (A.R. 1121-22).  August, 2017 PET CT tumor imaging from the skull base to the mid thigh showed no new suspicious pulmonary nodules and circumferential wall thickening of the terminal ileum, which might represent inflammatory/infectious process for which a colonoscopy was recommended (A.R. 1124-25).  An April, 2018 follow-up CT chest scan showed no acute cardiopulmonary process, stable pulmonary nodules, and bilateral adrenal nodules previously characterized as adenomas (A.R. 1308-09).

then taking any pain medication, but he was taking Depakote, Risperdal
and Benadryl (A.R. 44).  Plaintiff's mother then said that Plaintiff
had been diagnosed with schizophrenia when Plaintiff was 19 years old,
was on medication and had not had any "episodes" lately (A.R. 44).
Dr. Karnani reviewed Plaintiff's spine x-rays showing degenerative
changes (A.R. 44).[16]  Plaintiff reported a history of headache,
depression, lethargy, anxiety, fatigue, weight change, hypertension,
diabetes, arthritis, schizophrenia, hernia surgery, bunionectomy and
hospitalization for chest pain in 2006-07 (A.R. 44).  On examination,
Plaintiff reportedly had diminished bilateral grip strength (4+/5),
reduced pinprick, proprioception, temperature sensations and vibration
in the lower extremities, but otherwise normal findings (A.R. 44-45).
Dr. Karnani diagnosed cervical and lumbar radiculopathy, ligament
sprain in the cervical spine, and sprain of "other parts" of the
lumbar spine and pelvis (A.R. 45).  Dr. Karnani ordered EMG/nerve
conduction studies (id.).[17]

    Rheumatologist Dr. Bikramjit Ahluwalia evaluated Plaintiff on
February 1, 2016, for suspected osteoarthritis of the spine (A.R.
1141).  Plaintiff reportedly had arthritis and numbness in his

---

[16]    August, 2015 cervical, lumbar and thoracic spine x-rays
showed severe degenerative changes primarily at C5-C6, C6-C7,
L3-L4, L4-L5, L5-S1, and at the thoracolumbar junction (A.R. 636-
38; see also A.R. 902, 905 (October and November, 2006 lumbar and
cervical spine x-rays also showing degenerative changes)).

[17]    January, 2016 EMG/nerve conduction studies showed
evidence of bilateral carpal tunnel syndrome, sensory-motor
peripheral neuropathy in the lower extremities, and L4-L5
radiculopathy on the right side, for which clinical correlation
was recommended (A.R. 46-48).  Dr. Karnani recommended carpal
tunnel surgical evaluation and pain management (A.R. 46).

fingers, with no detailed examination findings (A.R. 1141).  Although the handwriting for this note is difficult to decipher, it appears that Dr. Ahluwalia assessed "OA" (osteoarthritis), "HTN" (hypertension), pre-diabetes,[18] osteogenesis imperfecta and schizophrenia (A.R. 1142).  Plaintiff followed up with Dr. Ahluwalia on February 22, 2016, reporting pain in his hands and back that supposedly limited his activities (A.R. 1138).  On examination, Plaintiff reportedly had Heberden's and Bouchard's nodes on his hands and crepitus in both knees (A.R. 1138).  Dr. Ahluwalia diagnosed Heberden's nodes with arthropathy, primary generalized osteoarthritis, other intervertebral disc degeneration in the lumbar spine and carpal tunnel syndrome (A.R. 1138-39).  Dr. Ahluwalia referred Plaintiff for pain management and also referred him to a surgeon for possible carpal tunnel release surgery (id.).

Orthopedist Dr. Matthew J. Pautz evaluated Plaintiff on February 22, 2016 (A.R. 1058-59).  Plaintiff complained of a more than 30 years history of back pain and sought a pain management referral (A.R. 1058).  On examination, Plaintiff reportedly had tenderness on palpation over the SI joint and paravertebral spasm with positive Waddell signs (A.R. 1058).  Lumbar spine x-rays reportedly showed diffuse facet arthropathy without spondylosis or spondylolisthesis or significant disc space settling (A.R. 1058).  Dr. Pautz diagnosed chronic pain syndrome, lumbago, lumbosacral spondylosis without

---

[18]    January, 2016 hemoglobin A1c testing was high at 5.9 in the "pre-diabetes" range (A.R. 1127; see also A.R. 1303 (March, 2018 testing also showing hemoglobin A1c in pre-diabetes range at 5.8)).

myelopathy lumbago and possible lumbar sprain, for which Dr. Pautz recommended pain management and physical therapy (A.R. 1058-59).

Orthopedic surgeon Dr. Rajiv Puri evaluated Plaintiff on July 20, 2016 (A.R. 43).  Plaintiff reported a history of numbness and tingling in both hands for the past several months, and spine pain without significant radiation to the upper or lower extremities (A.R. 43).  Plaintiff reportedly had been diagnosed by Dr. Karnani with bilateral carpal tunnel syndrome and some lower extremity radiculopathy based on recent EMG studies (A.R. 43).  On examination, Plaintiff reportedly had good range of motion, right-sided thoracic rib hump due to scoliosis, and decreased sensation in the median nerve distribution for both hands (A.R. 43; see also A.R. 898 (May, 2007 chest x-ray showing mild scoliosis)).  X-rays reportedly showed degenerative disc disease in the cervical spine at C5-C6 and C6-C7, right-sided mild thoracic scoliosis, but no remarkable lumbar spine findings (A.R. 43).  Dr. Puri diagnosed carpal tunnel syndrome and cervical spine arthritis and recommended left carpal tunnel release surgery (A.R. 43).

Despite the recommendations of Drs. Ahluwalia, Pautz and Puri, there are no reports in the record of physical therapy, specialized pain management or carpal tunnel release surgery.  Plaintiff next consulted with Dr. Shima Hadidchi on June 29, 2017, for alleged loss of memory (A.R. 1279).  Plaintiff asserted that he had lost consciousness approximately a month earlier and claimed he had worsening memory loss (A.R. 1279).  On examination, Plaintiff had no abnormalities (A.R. 1279).  Dr. Hadidchi diagnosed pre-diabetes, anxiety, loss of consciousness, depression screening and ordered blood

1 tests (A.R. 1279-80).

2

3      Consultative examiner Dr. Seung Ha Lim prepared an Internal

4 Medicine Consultation dated June 10, 2015 (A.R. 628-32).  Plaintiff

5 complained of hypertension, joint pain in the hands and feet, lower

6 back pain radiating to the chest with scoliosis, heart palpitations

7 with dizziness and shortness of breath, hypercholesterolemia, daily

8 radiating chest pain with some shortness of breath, hypoglycemia with

9 dizziness and weakness, blurry vision and multiple concussions with

10 headaches (A.R. 628-29).  Plaintiff denied a history of diabetes (A.R.

11 629).  On examination, Plaintiff reportedly had lesser grip strength

12 on the left non-dominant hand, normal spine curvature, pain on range

13 of motion in the back, and normal motor strength and tone without

14 atrophy (A.R. 630-31).  Dr. Lim found Plaintiff's normal blood

15 pressure reading indicated his hypertension was well controlled, and

16 Plaintiff did not present any signs of congestive heart failure (A.R.

17 631).  Plaintiff had normal range of motion in his hands and feet, no

18 signs of radiculopathy, regular heart beat, non-specific chest pain by

19 history, mildly decreased visual acuity in both eyes, and no signs of

20 intracranial bleeding (A.R. 631-32).  Dr. Lim opined that Plaintiff

21 was capable of performing medium work with no other impairment-related

22 limitations (A.R. 632).

23

24      State agency physicians reviewed the medical record in August of

25 2015 and found Plaintiff capable of medium work, giving "great weight"

26 to Dr. Lim's opinion (A.R. 196-206).  Plaintiff's affective disorder

27 was deemed nonsevere due to normal mental status examinations and

28 stable symptoms, with a note that Plaintiff's past hallucinations were

likely due to "DAA [drug and alcohol] involvement" (A.R. 201).   On reconsideration in February of 2016, state agency physicians agreed with the initial findings in the August, 2015 review (A.R. 208-19).

III. **Substantial Evidence Supports the Conclusion that Plaintiff Can Work.**

Substantial evidence supports the conclusion Plaintiff is not disabled.   Significantly, no treating physician ever opined Plaintiff is disabled from all work.   See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993); Curry v. Sullivan, 925 F.2d 1127, 1130 n.1 (9th Cir. 1990).   As summarized above, consultative examiner Dr. Lim endorsed a residual functional capacity generally consistent with the physical residual functional capacity the ALJ assessed.   Compare A.R. 30 (residual functional capacity) with A.R. 632 (Dr. Lim's opinion).   Dr. Lim's opinion constitutes substantial evidence to support the ALJ's determination of non-disability.   See Orn v. Astrue, 495 F.3d 625, 631-32 (9th Cir. 2007) (opinion of examining physician based on independent clinical findings can provide substantial evidence to support administrative conclusion of non-disability).   Additionally, the state agency physicians' opinions further support the Administration's decision (A.R. 196-206, 208-19).   See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (opinion of non-examining physician "may constitute substantial evidence when it is consistent with other independent evidence in the record"); Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (where the opinions of non-examining physicians do not contradict "all other evidence in the record" an ALJ properly may rely on these opinions) (citation and

emphasis omitted); <u>Curry v. Sullivan</u>, 925 F.2d at 1130 n.2 (same).

The vocational expert testified that a person with the residual functional capacity the ALJ found to exist could perform certain light and medium jobs existing in significant numbers in the national economy (A.R. 189-93).  The ALJ properly relied on this testimony in denying disability benefits.  <u>See</u> <u>Barker v. Secretary of Health and Human Services</u>, 882 F.2d 1474, 1478-80 (9th Cir. 1989); <u>Martinez v. Heckler</u>, 807 F.2d 771, 774-75 (9th Cir. 1986).

To the extent any of the medical evidence is in conflict, it was the prerogative of the ALJ to resolve such conflicts.  <u>See</u> <u>Lewis v. Apfel</u>, 236 F.3d 503, 509 (9th Cir. 2001); <u>see also</u> <u>Treichler v. Commissioner</u>, 775 F.3d 1090, 1098 (9th Cir. 2014) (court "leaves it to the ALJ" "to resolve conflicts and ambiguities in the record").  When evidence "is susceptible to more than one rational interpretation," the Court must uphold the administrative decision.  <u>See</u> <u>Andrews v. Shalala</u>, 53 F.3d at 1039-40; <u>accord</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 954 (9th Cir. 2002); <u>Sandgathe v. Chater</u>, 108 F.3d 978, 980 (9th Cir. 1997).  The Court will uphold the ALJ's rational interpretation of the evidence in the present case notwithstanding any conflicts in the evidence.

///

///

///

///

///

///

1  **IV.   Plaintiff's Remaining Arguments are Unavailing.**[19]

2

3       Plaintiff faults the Administration for failing to obtain medical

4  records concerning events occurring prior to the alleged onset date.

5  See Plaintiff's Motion, pp. 4-5; Plaintiff's Opposition, pp. 1-2.  The

6  ALJ appropriately focused on the period at issue, which ran from the

7  March 6, 2015 application date through the date of the ALJ's decision.

8  As summarized above, the ALJ appropriately included in the

9  administrative record medical reports dating back to one year prior to

10 the application date.  See A.R. 24; see also 20 C.F.R. §§ 416.335,

11 416.501 (Title XVI benefits are available from the month after the

12 month the application is filed); 20 C.F.R. § 416.912 (agency will

13 develop claimant's medical history for at least 12 months preceding

14 the month in which the claimant files his application); compare A.R.

15 739-41 (Plaintiff's list of medical providers with dates of service,

16 which reflects records summarized above for the relevant time period).

17 Furthermore, the ALJ also expressly considered Plaintiff's "complete

18 medical history" – which included a summary provided by Plaintiff and

19 hundreds of pages of records, detailed above, dating back to 1993.

20 See A.R. 24; see also A.R. 148 (ALJ admitting Exhibits through 17F at

21 the administrative hearing); A.R. 932-33 (Exhibit 14F, records from

22 1999); A.R. 1097-1113 (Exhibit 15F, records from 1993); A.R. 683-1297

23 _____

24       [19]   The Court has considered and rejected all of the
   arguments raised in Plaintiff's motion for summary judgment and
25 in Plaintiff's Opposition.  The Court discusses Plaintiff's
   principal arguments herein.  Neither Plaintiff's arguments nor
26 the circumstances of this case show any "substantial likelihood
   of prejudice" resulting from any error allegedly committed by the
27 ALJ.  See generally McLeod v. Astrue, 640 F.3d 881, 887-88 (9th
   Cir. 2011) (discussing the standards applicable to evaluating
28 prejudice).

(Exhibits 13F-15F, provided by Plaintiff).  Additionally, as Plaintiff admits, many of the records supposedly reflecting Plaintiff's schizophrenia diagnosis and hospitalizations do not exist because they are too old (A.R. 691-94).  Plaintiff has not demonstrated that the ALJ materially erred in failing to develop the medical record more fully.

Plaintiff also argues that Plaintiff's claimed 36-year history of paranoid schizophrenia was not reported to the ALJ.  See Plaintiff's Motion, p. 3.  Contrary to this argument, the medical record the ALJ reviewed contained several reports by both Plaintiff and his mother that he had a history of schizophrenia with several related hospitalizations dating back to when Plaintiff was 18 or 19 years old (A.R. 44, 134, 592-93, 737).  The ALJ was aware of Plaintiff's claimed mental health history, but stated that: (1) Plaintiff's mother testified that Plaintiff had no schizophrenic "incidents" for the past 15 years until the July, 2014 incident, when Plaintiff was drinking (A.R. 28-29, 174, 176); and (2) the record since January of 2015 suggests that Plaintiff's mental impairments are well controlled by medication (A.R. 28-29, 665-82, 1147-48).  In light of these statements and the medical evidence summarized above, the ALJ's failure expressly to acknowledge the post-July, 2014 references to schizophrenia in the record was, at most, harmless error.

Plaintiff also argues that the ALJ did not understand osteogenesis imperfecta, a "rare inherited brittle bone disease," which assertedly is related to Plaintiff's other physical conditions (i.e., scoliosis, osteoarthritis, chronic back pain, and "escalating

cardiac and respiratory issues"). See Plaintiff's Motion at 3. The ALJ found that Plaintiff had severe degenerative changes to the spine with radiculopathy, but found that the other conditions were not adequately documented in the record and were nonsevere impairments because Plaintiff assertedly had not alleged any work-related limitations based on osteogenesis imperfecta, scoliosis, arthritis, angina or tachycardia (A.R. 26-27; but see A.R. 351-61 (Plaintiff's October 16, 2015 Function Report detailing his alleged limitations, discussed, supra, n.6)).[20] The state agency physicians reviewed the medical records and considered Plaintiff's alleged osteogenesis imperfecta and related conditions, but found Plaintiff capable of medium work nevertheless (A.R. 196-204, 208-17). Dr. Lim also considered Plaintiff's related conditions in finding Plaintiff capable of medium work (A.R. 628-32). As discussed above, these opinions furnished substantial evidence supporting the ALJ's decision, and the

---

[20]    Notwithstanding this finding, in accordance with Social Security Ruling 16-3p and 20 C.F.R. § 416.929, the ALJ considered all of Plaintiff's alleged symptoms in determining Plaintiff's residual functional capacity (A.R. 30-32).  To the extent Plaintiff may argue that the ALJ erred in finding certain of Plaintiff's alleged conditions nonsevere because Plaintiff actually alleged specific limitations from all of his conditions (see Plaintiff's Motion, p. 10; Plaintiff's Opposition, pp. 4-5), any error is harmless.  See Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007) (finding any Step 2 error harmless where ALJ considered the impairment at Step 4); see also Buck v. Berryhill, 869 F.3d 1040, 1049 (9th Cir. 2017) (because the ALJ considers all impairments both severe and nonsevere in determining a claimant's residual functional capacity, "the [residual functional capacity] therefore should be exactly the same regardless of whether certain impairments are considered 'severe' or not") (emphasis original); Gray v. Commissioner, 365 Fed. App'x 60, 61-62 (9th Cir. 2010) (finding any Step 2 error harmless where ALJ considered nonsevere mental impairments in determining claimant's residual functional capacity).

ALJ appropriately relied on these doctors' interpretation of the evidence.

Plaintiff faults Dr. Lim's opinion as assertedly not containing sufficient detail regarding Plaintiff's conditions to: (1) conform to the Social Security Administration's guidelines (i.e., "Part IV - Adult Consultative Examination Report Content Guidelines" also known as the "Green Book," available at https://www.ssa.gov/disability/ professionals/greenbook/ce-adult.htm), listing the minimum contents required for consultative examiner reports; and (2) address Listing 1.00 from 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (the "Listings"). See Plaintiff's Motion, pp. 5-7; Plaintiff's Opposition, pp. 3-4. Plaintiff has failed to demonstrate any material discrepancy between Dr. Lim's report and the Green Book's guidelines.  In any event, the Green Book is not legally binding on the Administration or this Court. See, e.g., Stitely v. Commissioner, 2014 WL 5834700, at *5 (D. Md. Nov. 10, 2014), aff'd, 621 Fed. App'x 148 (4th Cir. 2015) (rejecting claim that consultative examination did not comply with Green Book); accord Schweiker v. Hansen, 450 U.S. 785, 789 (1980) (the Social Security Claims Manual "is not a legal regulation.  It has no legal force, and it does not bind the SSA.").  The ALJ was free to rely on Dr. Lim's opinion as substantial evidence to support the non-disability determination.

Plaintiff may be arguing that the ALJ erred in failing to find that he meets or equals Listings 1.04 (disorders of the spine), 12.03 (schizophrenia spectrum and other psychotic disorders), 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and

obsessive-compulsive disorders) or 12.15 (trauma and stressor-related disorders) (see Plaintiff's Motion, pp. 7-8, 11-12; Plaintiff's Opposition, pp. 6-8; see also A.R. 477, 484-518 (Plaintiff's argument re same presented to the Appeals Council)).

Plaintiff has the burden of demonstrating disability under the Listings.  See Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996); see Sullivan v. Zebley, 493 U.S. 521, 530-31 (1990), superseded by statute on other grounds as stated in Kennedy v. Colvin, 738 F.3d 1172, 1174 (9th Cir. 2013) (burden is on the claimant to show that his or her impairment meets all of the specified medical criteria for a Listing, or present medical findings equal in severity to all the criteria for the most similar listed impairment).  An impairment or combination of impairments that manifests only some of the criteria, no matter how severely, does not qualify.  Sullivan v. Zebley, 493 U.S. at 530.  Here, Plaintiff failed to carry this burden.

Under Listing 1.04, Plaintiff must demonstrate that his spine disorder "result[s] in compromise of a nerve root . . . or the spinal cord" with:

A.  Evidence of nerve root compression characterized by
    neuro-anatomic distribution of pain, limitation of motion of
    the spine, motor loss (atrophy with associated muscle
    weakness or muscle weakness) accompanied by sensory or
    reflex loss and, if there is involvement of the lower back,
    positive straight-leg raising test (sitting and supine); OR

1    B.   Spinal arachnoiditis, confirmed by an operative note or
2    pathology report of tissue biopsy, or by appropriate
3    medically acceptable imaging, manifested by severe burning
4    or painful dysesthesia, resulting in the need for changes in
5    position or posture more than once every 2 hours; OR

6

7    C.   Lumbar spinal stenosis resulting in pseudoclaudication,
8    established by findings on appropriate medically acceptable
9    imaging, manifested by chronic nonradicular pain and
10   weakness, and resulting in inability to ambulate
11   effectively.

12

13   20 C.F.R. Part 404, Subpt. P, App. 1, § 1.04.  The ALJ found that
14   Plaintiff did not meet Listing 1.04 because he: (1) does not have
15   motor loss (having repeatedly exhibited 5/5 motor strength in all
16   extremities, see A.R. 44-45, 630-31, 1058 (reporting "5/5" or normal
17   motor strength)) (1.04A); (2) does not have a diagnosis of spinal
18   arachnoiditis and has not experienced "severe burning or painful
19   dysesthesia" (1.04B); and (3) there are no findings of
20   pseudoclaudication or the need to use an assistive device for
21   ambulating (1.04C) (A.R. 28).  The record supports this determination.
22   Plaintiff's arguments to the contrary fail to demonstrate that he
23   meets or equals Listing 1.04.

24

25   To meet the mental disorders listings at issue (i.e., Listings
26   12.03, 12.04, 12.06 and 12.15), Plaintiff must demonstrate that he
27   fulfills the requirements of paragraphs A and B, or paragraphs A and
28   C:

Paragraph A of each listing . . . includes the medical
criteria that must be present in [the] medical evidence.   []
Paragraph B of each listing . . . provides the functional
criteria [assessed], in conjunction with a rating scale
. . . to evaluate how [the claimant's] mental disorder
limits [his or her] functioning [in four areas (i.e., the
ability to (1) understand, remember or apply information;
(2) interact with others; (3) concentrate, persist or
maintain pace; and (4) adapt or manage oneself)]. . . .   To
satisfy the paragraph B criteria, [a claimant's] mental
disorder must result in "extreme" limitation of one, or
"marked" limitation of two, of the four areas of mental
functioning. . . .   []   Paragraph C of Listings 12.02,
12.03, 12.04, 12.06, and 12.15 provides the criteria [used]
to evaluate "serious and persistent mental disorders" * * *
[i.e.,] when there is a medically documented history of the
existence of the mental disorder. . . . over a period of at
least 2 years . . . and [1] [a claimant relies] on an
ongoing basis, upon medical treatment, mental health
therapy, psychosocial support(s), or a highly structured
setting(s), to diminish the symptoms and signs of [the]
mental disorder[; and 2] when the evidence shows that,
despite [a claimant's] diminished symptoms and signs, [the
claimant has] achieved only marginal adjustment.   "Marginal
adjustment" means that [] adaptation to the requirements of
daily life is fragile; that is, [the claimant has] minimal
capacity to adapt to changes in [the claimant's] environment
or to demands that are not already part of [the claimant's]

1    daily life.

2

3    20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00 et seq.  The ALJ found

4    that Plaintiff did not meet the Listings for a mental disorder

5    because: (1) Plaintiff's impairment does not cause at least one

6    extreme or two marked limitations in the four areas of functioning for

7    the paragraph B criteria (i.e., Plaintiff has at most moderate

8    limitations in the four areas) (A.R. 28-29 (concluding same based

9    largely on Plaintiff's normal mental status examinations since January

10   of 2015 at A.R. 665-82, 1147-48); see also A.R. 201, 214 (state agency

11   physicians finding at most mild limitations in the four areas of

12   functioning based on their review of the medical records)); and

13   (2) Plaintiff testified to performing a wide variety of activities of

14   daily living and admitted that he could perform simple work in a low

15   stress environment (A.R. 169-70), which suggests he is capable of more

16   than a "minimal capacity to adapt to changes in [his] environment or

17   to demands that are not already part of [his] daily life" for the

18   paragraph C criteria (A.R. 29-30; see also A.R. 201, 214 (state agency

19   physicians also concluding that Plaintiff does not meet the paragraph

20   C criteria)).  Again, the record supports the ALJ's conclusions.

21   Again, Plaintiff's arguments to the contrary do not demonstrate that

22   he meets or equals any of these listings.

23

24   While Plaintiff argues contrary interpretations of the record

25   evidence and relies heavily on his mother's report of Plaintiff's

26   functioning, it was for the ALJ to interpret the evidence, evaluate

27   credibility and resolve any conflicts in the evidence.  See Treichler

28   v. Commissioner, 775 F.3d 1090, 1098 (9th Cir. 2014); Lewis v. Apfel,

236 F.3d 503, 509 (9th Cir. 2001); <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039-40 (9th Cir. 1995).  As previously stated, the Court will uphold the ALJ's rational interpretation of the evidence notwithstanding any conflicts therein.

**CONCLUSION**

For all of the foregoing reasons, Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: June 9, 2020.

/s/
_____
CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE